1  Allan Browne (State Bar No. 34923)
   Sonia Y. Lee (State Bar No. 191837)
2  BROWNE WOODS & GEORGE LLP
   450 North Roxbury Drive, Seventh Floor
3  Beverly Hills, California  90210-4231
   Tel. (310) 274-7100 / Fax (310) 275-5697
4

FILED
CLERK U.S. DISTRICT COURT
JAN 1 5 2008
CENTRAL DISTRICT OF CALIF.

5  Attorneys for Plaintiff
   DENICE SHAKARIAN HALICKI,
6  THE ORIGINAL GONE IN 60 SECONDS LLC,
   HALICKI FILMS, LLC, and ELEANOR LICENSING, LLC
7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10
   DENICE SHAKARIAN HALICKI, an       )   Case No.  CV07-6859-SJO(PJWx)
11 individual, THE ORIGINAL GONE IN 60 )
   SECONDS LLC, a Delaware limited    )
12 liability company, HALICKI FILMS, LLC, )  [PROPOSED] FIRST AMENDED
   a California limited liability company, and )  COMPLAINT FOR
13 ELEANOR LICENSING, LLC, a         )
   Delaware limited liability company,  )
14                                     )   1.   Common Law Trademark
              Plaintiffs,              )        Infringement;
15                                     )
       vs.                             )   2.   Violation of the Lanham Act;
16                                     )
   CARROLL SHELBY, an individual,     )   3.   Dilution of Trademark;
17 CARROLL SHELBY INTERNATIONAL,      )
   INC., a Nevada corporation, CARROLL )   4.   Copyright Infringement;
18 SHELBY LICENSING, INC., a California )
   corporation, CARROLL SHELBY        )   5.   Constructive Trust;
19 ENGINEERING, INC., a California     )
   corporation, CARROLL SHELBY        )   6.   Declaratory Relief; and
20 MOTORS, INC., a California corporation, )
   CARROLL SHELBY DISTRIBUTION        )   7.   Declaratory Relief
21 INTERNATIONAL, INC., a California   )
   corporation, CARROLL HALL SHELBY   )
22 TRUST, UNIQUE MOTORCARS, INC., a    )   DEMAND FOR JURY TRIAL
   Texas corporation, UNIQUE          )
23 PERFORMANCE, INC., a Texas         )
   Corporation, SANDERSON SALES &     )
24 MARKETING, a Texas corporation,    )
   STEVE SANDERSON, an individual,    )
25 SANDERSON C&C, LTD, a Texas limited )
   partnership, SANDERSON C&C         )
26 MANAGEMENT, LLC, a Texas limited   )
   liability company, and DOES 4 through )
27 10, inclusive,                     )
                                      )
28

─────────────────────────────────────────────
            [PROPOSED] FIRST AMENDED COMPLAINT

Defendants.                    )

_____ )

Plaintiffs Denice Shakarian Halicki, The Original Gone in 60 Seconds LLC, Halicki Films LLC, and Eleanor Licensing LLC (collectively, "Plaintiffs") complain and allege as follows:

## THE PARTIES

1.     Plaintiff Denice Shakarian Halicki ("Denice") is, and at all relevant times herein was, a natural citizen of the State of California with her principal place of residence in the County of Los Angeles, State of California.

2.     Plaintiff The Original Gone in 60 Seconds LLC is a Delaware limited liability corporation, with its principal place of business in the County of Los Angeles, State of California.

3.     Plaintiff Halicki Films LLC is a California limited liability corporation, with its principal place of business in the County of Los Angeles, State of California.

4.     Plaintiff Eleanor Licensing LLC is a Delaware limited liability corporation, with its principal place of business in the County of Los Angeles, State of California.

5.     Plaintiffs are informed and believe, and based thereon allege, that Defendant Carroll Shelby is a natural citizen of the State of California.

6.     Plaintiffs are informed and believe, and based thereon allege, that Defendant Carroll Shelby International, Inc. is a corporation or other type of business entity organized under the laws of the State of Nevada and doing business in the State of California.

7.     Plaintiffs are informed and believe, and based thereon allege, that the Defendant Carroll Shelby Licensing, Inc. is a corporation or other type of business entity organized under the laws of the State of California.

-1-

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

1     8.     Plaintiffs are informed and believe, and based thereon allege, that

2  Defendant Carroll Shelby Engineering, Inc. is a corporation or other type of business

3  entity organized under the laws of the State of California.

4     9.     Plaintiffs are informed and believe, and based thereon allege, that

5  Defendant Carroll Shelby Motors, Inc. is a corporation or other type of business entity

6  organized under the laws of the State of California.

7     10.    Plaintiffs are informed and believe that Defendant Carroll Shelby

8  Distribution International, Inc. is a corporation or other type of business entity

9  organized under the laws of the State of California.

10    11.    Plaintiffs are informed and believe, and based thereon allege, that

11  Defendant Carroll Hall Shelby Trust is a trust formed under the laws of the State of

12  California.

13    12.    Plaintiffs are informed and believe, and based thereon allege, that

14  Defendant Unique Motorcars, Inc. is a corporation or other type of business entity

15  organized under the laws of the State of Texas, doing business as Unique

16  Performance, Inc. in the State of California.

17    13.    Plaintiffs are informed and believe, and based thereon allege, that

18  Defendant Unique Performance, Inc. is a corporation or other type of business entity

19  organized under the laws of the State of Texas, and doing business in the State of

20  California.

21    14.    Plaintiffs are informed and believe, and based thereon allege, that

22  Sanderson Sales and Marketing is a corporation or other type of business entity

23  organized under the laws of the State of Texas, and doing business in the State of

24  California.

25    15.    Plaintiffs are informed and believe, and based thereon allege, that Steve

26  Sanderson is a natural citizen of the State of Texas.

27    16.    Plaintiffs are informed and believe, and based thereon allege, that

28  Sanderson C&C, Ltd. is a limited partnership organized under the laws of the State of

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

1  Texas, and doing business in the State of California.  Plaintiffs are further informed

2  and believe, and based thereon allege, that the general partner of Sanderson C&C, Ltd.

3  is Sanderson C&C Management, LLC, a limited liability company organized under the

4  laws of the State of Texas, and doing business in the State of California.

5      17.    Plaintiffs are unaware of the true names and capacities of defendants

6  DOES 4 through 10, inclusive, and therefore sue these defendants by such fictitious

7  names. When the true names and capacities of defendants DOES 4 through 10,

8  inclusive, have been ascertained, Plaintiffs will amend the complaint to set forth such

9  facts. Defendants Carroll Shelby, Carroll Shelby International, Inc., Carroll Shelby

10 Licensing, Inc., Carroll Shelby Engineering, Inc., Carroll Shelby Motors, Inc., Carroll

11 Shelby Distribution International, Inc., Carroll Hall Shelby Trust, Unique Motorcars,

12 Inc., Unique Performance, Inc., Sanderson Sales & Marketing, Steve Sanderson,

13 Sanderson C&C, Ltd., and Does 4 through 10 are referred to herein collectively as

14 "Defendants."

15     18.    Plaintiffs are informed and believe, and based thereon allege, that

16 sometime prior hereto, Defendants and each of them conspired together and

17 maliciously and wilfully entered into a scheme to engage in the course of conduct

18 described herein.  Plaintiffs are further informed and believe, and based thereon

19 allege, that in pursuance of said conspiracy and scheme, Defendants and each of them

20 did the acts and things herein alleged, and all of such acts and things were participated

21 in and done by all of said Defendants or by one or more of them as steps in said

22 conspiracy.

23

24                      **JURISDICTION AND VENUE**

25     19.    Jurisdiction in this Court is proper as this complaint poses federal

26 questions arising under particular federal statutes, including the United States

27 Copyright Act (17 U.S.C. 101 *et seq.*) and the Lanham Act (15 U.S.C. 1125 *et seq.*).

28 To the extent this complaint contains claims for relief under California law, those

162466.1          **[PROPOSED] FIRST AMENDED COMPLAINT**

1   claims are specifically authorized to be brought in this Court under the supplemental

2   jurisdiction provision of 8 U.S.C. § 1367.

3       20.     This court has personal jurisdiction over Defendants as they are

4   conducting business in the State of California by, among other things, offering the

5   offending motor vehicles and related products for sale in the State of California, as

6   well as licensing the "Eleanor" name and launching other business ventures here.

7       21.     Venue is proper in the state of California as the wrongful actions

8   complained of herein were and are being committed in this judicial district, and

9   Plaintiffs reside in this judicial district.

10

11                          **GENERAL ALLEGATIONS**

12  **The "Original Movie" Starring Eleanor**

13      22.     Denice is the widow of deceased movie and performance car personality

14  H.B. "Toby" Halicki ("Toby"), affectionately known in automobile and movie circles

15  as "The Car Crash King."  As a director, producer, financier and actor, Toby made

16  action films that were noted for their intricate stunts and intense car crashes.

17      23.     In 1974, Toby wrote, produced, acted in, financed, directed and marketed

18  the original film "Gone in 60 Seconds" (the "Original Movie").  The undisputed star

19  of the Original Movie was a car by the name of "Eleanor," a 1971 Fastback Mustang

20  custom built by Toby to resemble a Mach 1 Fastback Mustang.  Eleanor was the only

21  star to receive a billing credit at the beginning of the film.  No other actor was named

22  specifically in the opening credits.  Indeed, so special was Eleanor that she was the

23  only star featured on the cover of the original videotape and the subsequently-released

24  DVDs of the Original Movie, and was featured prominently in the advertising, public

25  relations, and marketing of the film when the film was originally released and at all

26  times thereafter.

27      24.     The storyline of "Gone in 60 Seconds" was simple, yet genius.  It

28  appealed to both car enthusiasts and the general public alike.  At first blush, "Gone in

-4-

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

1  60 Seconds" is the story of Toby's character (Maindrian Pace) and his cohorts'

2  attempts to steal 48 specific cars in one week to fulfill a contract. At its heart,

3  however, "Gone in 60 Seconds" is the story of one car and Maindrian's checkered and

4  tortured relationship with that car. It is the story of Eleanor – the one "woman" that

5  had eluded and bedeviled Maindrian through time. It is the story of Maindrian's

6  attempts to finally get his "girl." Indeed, the movie culminates with a fantastical 40-

7  minute long chase scene in which Maindrian and Eleanor lead scores of police cars

8  through seven counties and dozens of car crashes before, at last, they "ride off into the

9  sunset."

10      25.    This chase scene, noted in the annals of film making as one of the

11  greatest and most ambitious car stunts ever, along with the allure and magic of

12  Eleanor, which Toby actively and continuously cultivated and commercialized at trade

13  shows, car shows, through merchandising and promotions, helped Toby and "Gone in

14  60 Seconds" – essentially an "independent" movie without studio backing – gross an

15  impressive $40 million in 1974. The movie and Toby's efforts also catapulted Eleanor

16  into a full-fledged movie star. She went on to star in at least two additional films

17  produced and directed by Toby, entitled "The Junkman" and "Deadline Auto Theft."

18      26.    Toby registered a copyright for the Original Movie on August 5, 1983.

19  Tragically, in 1989, Toby was killed during a stunt sequence while filming "Gone in

20  60 Seconds 2," which also featured Eleanor. Thereafter, by operation of law, in 1994,

21  Denice obtained all right, title and interest in the Original Movie and the character

22  "Eleanor" from the estate of H.B. "Toby" Halicki. On March 11, 1999, Denice

23  recorded the passing of the copyrights for the Original Movie and the characters

24  therein, including "Eleanor," to her by succession.

25      27.    Denice and Toby have consistently maintained protection over the

26  "Eleanor" character and mark and the "Gone in 60 Seconds" film and mark, and

27  placed goods and services in the stream of commerce, including replicas of Eleanor

28  and other Eleanor- and "Gone in 60 Seconds"- related merchandise. They also

1   continuously used Eleanor in the stream of commerce displaying Eleanor at various
2   shows and events throughout the nation.  For example, to promote the Original Movie
3   on its initial release, Toby took Eleanor on a tour across the United States.  As part of
4   this publicity tour, Eleanor was featured as a star attraction at the first Long Beach
5   Grand Prix.  Further, Eleanor was featured in an exhibit entitled "Great Cars of the
6   Movies," which ran for four months at the Peterson Automotive Museum, and she was
7   the star attraction at the California Classic Car Rally and "L.A. 2000 NASCAR Street
8   Race."

9       28.   Denice and Toby further added to the value of the "Eleanor" and "Gone
10   in 60 Seconds" marks by, among other things, their licensing of the marks, and by
11   reissuing the Original Movie and its sequels on DVD and VHS in 2000.

12   **The Agreement with HPC**

13       29.   In no small part due to the popularity and appeal of the character of
14   Eleanor, in 1995, the President of Hollywood Pictures Corporation ("HPC"), a
15   division of The Walt Disney Company, approached Denice about developing a remake
16   or sequel of the Original Movie.  Following extensive negotiations, on October 12,
17   1995, Denice entered into a Memorandum of Agreement ("Agreement") with HPC to
18   develop and remake the Original Movie.

19       30.   By the express terms of the Agreement, Denice granted to HPC
20   exclusively all right, title and interest of every kind and nature in and to sequels to
21   and/or remakes of the Original Movie, including, among other things, the right to
22   produce a motion picture based upon or adapted from all or any part of the Original
23   Movie.

24       31.   By further express terms of the Agreement, Denice reserved to herself the
25   right to manufacture, sell and distribute merchandise utilizing the car known as
26   "Eleanor."   At all times relevant, it was the intent, desire and understanding of the
27   parties to the Agreement – HPC and Denice – that Denice would and did reserve to
28   herself the sole and exclusive merchandising rights to the character of "Eleanor," as

1  the car appears in the Original Movie or as it appears in any remake or sequel thereof

2  in whatever form.

3       32.   In September 2000, Denice assigned to plaintiff The Original Gone in 60

4  Seconds LLC a license for certain rights in "Gone in 60 Seconds" that she had not

5  already licensed to HPC.

6  **The Remake Starring Eleanor**

7       33.   In 2000, HPC released the remake of the Original Movie "Gone in 60

8  Seconds" (the "Remake"). HPC registered a copyright for the Remake on June 28,

9  2000 (Registration No. PA0000933893).

10       34.   The Remake starred Nicholas Cage, Angelina Jolie, Robert Duvall, and

11  Eleanor.  As with the Original Movie, Eleanor in the Remake is a vintage Ford

12  Fastback Mustang.  This time, she was "tricked out" for the movie to look like a

13  "futuristic movie version" of a Ford Mustang Shelby GT500, a car developed and

14  produced under the leadership of Lee Iacocca, who became known as the "Father of

15  the Mustang."  However, as admitted by Defendant Carroll Shelby, Eleanor in the

16  Remake is not an authentic 1967 Shelby Mustang.  Not only was Eleanor's body or

17  shell not built utilizing an authentic Shelby Mustang, Eleanor in the Remake

18  contained various design elements that were unique to Eleanor, which do not appear

19  on any stock versions of the Ford Fastbacks or the Shelby GT500s.  There has never

20  been an Eleanor in the Original Movie or the Remake that was built from a Shelby

21  GT500.

22       35.   As with the Original Movie, Eleanor was once again prominently

23  featured as a star in the Remake.  Similar to the Original Movie, the storyline for the

24  Remake called for the main character played by Nicholas Cage (named "Memphis

25  Raines") and his gang to steal 50 specific, high-end cars within 24 hours.  However,

26  Eleanor and her role in the movie did not change at all.  She is again the car that is

27  referenced by name most often, the one that evaded Memphis's grasp time and again,

28  and her relationship to Memphis Raines is integral to the advancement and

**[PROPOSED] FIRST AMENDED COMPLAINT**

1    development of the movie.  Eleanor is referred to in the Remake as Memphis's

2    "unicorn," that mystical, mythical creature impossible to capture.  Yet, at the end of

3    the movie, following a 12-minute complicated and complex car chase sequence to

4    elude the police, Memphis and Eleanor once again drive off into the distance.

5        36.    The Remake achieved even greater success than the Original Movie,

6    grossing over $101 million in domestic sales and $232 million worldwide.

7        37.    Confirming her importance to the movie, Eleanor was purposefully and

8    conspicuously featured on all promotional, marketing, advertising and merchandising

9    materials for the Remake, including, among other things, movie posters, DVD covers,

10   CD covers, and banners.   Additionally, Eleanor from the Remake as well as Eleanor

11   from the Original Movie have continuously made appearances at various shows and

12   events throughout the nation.  Plaintiffs and HPC have continuously and consistently

13   maintained protection over the Eleanor character and "Gone in 60 Seconds," whether

14   in the Original Movie or the Remake.

15       38.    As a result of the Original Movie, the Remake, and all of the efforts of

16   Plaintiffs and HPC to promote, market and commercialize Eleanor, the character of

17   Eleanor and the name and mark of "Eleanor" became indelibly linked and inseparable

18   in the minds of the public with the movie itself.  Thus, "Eleanor" has acquired a

19   distinctiveness and a secondary meaning with the consumers.

20   **Defendants' Blatant Theft of Eleanor**

21       39.    Defendants are in the business of manufacturing, marketing and selling –

22   without the authorization, consent or knowledge of HPC or Plaintiffs – "knock offs"

23   of "Eleanor" vehicles featured in the Remake.  These knock offs, as with the authentic

24   Eleanor, are built from 1967 and 1968 Ford Fastback Mustangs, not from Ford Shelby

25   GT500s.

26       40.    Defendants make no pretense or apologies about their blatant

27   infringement of Plaintiffs' trademark or copyright in the Remake or in Eleanor.  At no

28   time, did the Defendants even attempt to claim that their knock-off vehicles were

-8-

1   originals or that they were not identical duplicates of Eleanor from the Remake. To

2   the contrary, in sworn deposition testimony given in a related action, Defendants

3   admitted that they first learned about Eleanor (and got their idea to rip off Eleanor)

4   after seeing her in the Remake:

5          A.     Douglas Hasty, one of the founders and, Plaintiffs are informed and

6   believe, and based thereon allege, an officer and director of defendants Unique

7   Performance, Inc. and Unique Motorcars, Inc. (collectively, "Unique Defendants"),

8   testified as follows:

9                 Q.    Okay.  When is the first time you heard the name Eleanor in

10                      connection with a car?

11                A.    Was in the release of the 2000 version of "Gone in 60

12                      Seconds."

13                . . . .

14                Q.    Let's cut to the chase.  Did you do it [manufacture the

15                      offending vehicles] because you had seen that the car in

16                      "Gone in 60 Seconds" 2000 was a gray car with black

17                      stripes?

18                A.    I was inspired by the movie to build a car that was similar to

19                      the car seen in the remake 2000.

20         B.     Chris Layne, another founder and, Plaintiffs are informed and

21   believe, and based thereon allege, an officer and director of Unique Defendants also

22   testified that the first time he had ever heard the name "Eleanor" used in relation to a

23   car was in the movie "Gone in 60 Seconds."

24         C.     Defendant Carroll Shelby admitted the same:

25                Q.    Had you ever heard the name Eleanor in connection with a

26                      car before seeing that movie [Remake]?

27                A.    No that I recall.

28                . . . .

1  Q.  Did you come up with the name Eleanor for the car?

2  A.  No.

3  D.  Likewise, John Luft, a Vice President of defendants Carroll Shelby

4  entities, testified that (1) Eleanor was a "lead" in the Remake, and (2) the first time he

5  heard the name Eleanor being associated with a car was in the " 'Gone in 60 Seconds'

6  2000" movie.

7  E.  Neil Cummings, the in-house counsel for defendants Carroll

8  Shelby entities and, Plaintiffs are informed and believe, and based thereon allege, an

9  officer of such entities, testified as follows:

10  Q.  When is the first time that you heard the expression

11  "Eleanor" used in conjunction with a car?

12  A.  Probably when I saw the movie "Gone in 60 Seconds," the

13  2000 version.

14  F.  Indeed, Mr. Cummings admitted that, until they had seen the

15  Remake, Defendants had not even discussed or even entertained the idea of

16  manufacturing any cars and calling them "Eleanor" or referring to them as "Eleanor."

17  G.  Defendant Steve Sanderson also testified that the first time he

18  heard the word Eleanor used in conjunction with a car was in the Remake.  And, Mr.

19  Sanderson further made it clear in his testimony that the offending vehicles produced

20  and sold by Defendants were "obvious" "clone[s] of the car that was in the movie. . .

21  ."

22  41.  In point of fact, the agreement entered into by and between the

23  Defendants to manufacture and sell the offending vehicles states, in no uncertain

24  terms, that the Defendants were to "manufacture 1967 and 1968 Mustangs to ***look and***

25  ***perform like 'Eleanor' in the movie 'Gone in Sixty [sic] Seconds' (2000 version).***"

26  42.  In marketing these infringing vehicles, Defendants admittedly billed the

27  cars as "Eleanor" from the movie "Gone in 60 Seconds."  Defendants' facilities at

28  which the cars are built feature giant posters from the Remake further giving the

1    misimpression that these offending vehicles are authorized by or associated with the

2    movie. Moreover, Defendant Carroll Shelby brazenly misrepresented to the public

3    that he "shares rights with Disney [HPC's parent] for the Eleanor name," and falsely

4    implied that he had HPC's authority and consent to manufacture the infringing

5    vehicles.

6        43.    Yet, defendant Shelby admitted that he had no rights to or involvement in

7    the Remake:

8          Q.    Are you claiming any rights in "Gone in 60 Seconds"?

9          A.    Not that I know of.

10         . . . .

11         Q.    Okay.  You don't own any copyright in the film, do you?

12         A.    "Gone in 60 Seconds"?

13         Q.    Yes, sir.

14         A.    No.

15         . . . .

16         Q.    You weren't a consultant on either film, were you?

17         A.    No.

18         Q.    You weren't a screenwriter?

19         A.    No.

20         Q.    Or a producer or director?

21         A.    No.

22        44.    At all times herein relevant, Defendants knew that they did not have the

23    right to copy or clone Eleanor from the Remake.  They admittedly had discussions

24    among themselves about contacting HPC to obtain the licensing rights to produce such

25    vehicles, but deliberately chose not to do so.  Mr. Sanderson testified that when

26    Defendants first discussed the idea of producing and selling these offending vehicles,

27    he "point blank" asked the other Defendants about "getting the movie people

28    involved."  Carroll Shelby's response demonstrates the knowing, willful and

1  deliberate disregard by the Defendants of Plaintiffs' rights and interests.  According to

2  Mr. Sanderson, Mr. Shelby responded as follows:

3      A.    . . . And Mr. Shelby made the comment excuse my bluntness but

4            quote unquote "fuck them." . . . If they sue me, I'll sue them right

5            back.

6  45.    Mr. Hasty also admitted that, although he knew that the Remake was

7  made by Disney, he made no attempt to contact them about obtaining the rights to

8  manufacture and sell "Eleanor" vehicles:

9      Q.    Have you ever had any discussion with anybody at Disney about

10           rights to the character Eleanor?

11     A.    No.

12     Q.    Have you ever spoken with anybody at Disney about "Gone in 60

13           Seconds" 2000?

14     A.    No.

15     . . . .

16     Q.    Okay.  When you found out that it was a Disney production, did

17           you contact anybody at Disney about rights in Eleanor?

18     A.    No.

19  46.    Mr. Luft also admitted that they did not have the right to use "Gone in 60

20  Seconds" to market the knock off "Eleanors."

21     Q.    Did you feel that you – that the Shelby organization had the right to

22           use the expression "Gone in 60 Seconds"?

23     A.    No.

24  47.    Defendants knew that they had no right to knock off the "Eleanor"

25  character from the Remake.  Before Defendants entered into the scheme and

26  conspiracy to knock-off the "Eleanor" character, defendant Shelby was introduced to

27  Denice by Lee Iacocca at a car event at which the Eleanors from both the Original

28  Movie and Remake were on display.  Mr. Iacocca introduced Denice to defendant

-12-
**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

1   Shelby as the owner of such vehicles and the wife of the late creator of the Original

2   Movie and Eleanor.

3       48.    Yet, despite the fact that Plaintiffs are the prior users of the "Eleanor"

4   mark and Defendants knew they had no right to such a mark, Defendant Carroll Hall

5   Shelby Trust deliberately and wrongfully registered the "Eleanor" trademark with the

6   Patent and Trademark Office, registration number 2837333, for "vehicles, namely,

7   automobiles, engines for automobiles, and structural parts for automobiles."

8   Defendant Carroll Hall Shelby Trust also applied for a registration for the "Eleanor"

9   trademark for "toys, namely, die-cast metal model cars" in 2001, but subsequently

10  abandoned the registration.  Defendant Shelby personally signed at least one of these

11  applications.

12      49.    Further evidencing their willful infringement, when Mr. Iacocca

13  confronted Defendant Shelby about his improper registering of the "Eleanor"

14  trademark, Mr. Shelby outright misrepresented to Mr. Iacocca that he [Mr. Shelby]

15  had done so.  Instead, Mr. Shelby sought to hide his wrongdoing by misrepresenting

16  that his "partners in Texas [Unique Defendants] had the rights to 'Eleanor' from

17  'Gone in 60 Seconds.'"

18      50.    Plaintiffs are informed and believe, and based thereon allege, that

19  Defendants' intent and purpose in seeking to register the "Eleanor" mark, in

20  contravention of the Plaintiffs' rights, was to exploit and capitalize on the goodwill,

21  value and marketability of the "Eleanor" character, name and mark created and

22  developed by Plaintiffs and Toby.  By way of example, Shelby registered the "GT-

23  500" mark (international registration number 0905326) *six days after* he registered

24  the "Eleanor" mark for automobiles.  The Ford Shelby GT-500 purports to be Shelby's

25  claim to fame in the automobile circle.  Yet, he failed to registered the mark for nearly

26  35 years.  Plaintiffs are informed and believe, and based thereon allege, that

27  Defendants, in particular Shelby, knew that the "GT-500" mark on the infringing

28

1   vehicles would be worthless without the "Eleanor" mark. It is the "Eleanor" mark that

2   allowed Defendants to make millions of dollars by selling the infringing vehicles.

3       51.   Plaintiffs are informed and believe, and based thereon allege, that

4   Defendants currently market at least three versions of "Eleanors" at prices ranging

5   from $119,000 to $214,000. Defendants have further expanded their exploitation of

6   "Eleanor" by, among other things, marketing bronze scale models of "Eleanor" –

7   which sell for $5,900 apiece – as well as "Eleanor" clothing goods; licensing

8   "Eleanor" to Quaker State/Pennzoil for use in an advertisement and licensing

9   "Eleanor" for a video game; selling posters of Shelby and "Eleanor"; and constructing

10  a race car with the "Gone in 60 Seconds" and "Eleanor" marks on it. Defendants have

11  also engaged in extensive commercial promotion of the offending products in a

12  manner that intentionally treads on Plaintiffs' rights.

13  **Plaintiffs' Related Prior Action**

14      52.   As a result of the Defendants' blatant and deliberate violation of the

15  Plaintiffs' rights, in October 2004, Denice, The Original Gone in 60 Seconds, LLC,

16  and Halicki Films, LLC brought an action against defendants Carroll Shelby

17  International, Inc., Carroll Shelby, Carroll Shelby Licensing, Inc., Carroll Shelby

18  Engineering, Inc., Carroll Shelby Motors, Inc., Carroll Shelby Distribution

19  International, Inc., Carroll Hall Shelby Trust, Unique Motorcars, Inc., Unique

20  Performance, Inc., Sanderson Sales & Marketing, and Does 2 through 10, inclusive,

21  for, among other things, copyright infringement, common law trademark infringement,

22  federal unfair competition and false advertising, statutory unfair competition, and

23  intentional and negligent interference with prospective economic advantage (USDC

24  Case No. CV 04-8813 SJO (PHWx)) (the "Prior Action").

25      53.   HPC first discovered the wrongful conduct of Defendants in or about

26  February 2005. At that time, HPC was served with a Subpoena in a Civil Case in the

27  Prior Action, which subpoena sought the production, among other things, of

28  documents relating to the Agreement entered into by and between HPC and Denice.

54.   The service of the subpoena was the first notice HPC received that there was any potential infringement of its rights and interests in the Remake or the character of Eleanor from the Remake.

55.   On or about November 15, 2005, the Honorable James Otero, Judge of the United States District Court, for the Central District of California, granted the motion for summary judgment brought by the defendants.  In short, the defendants' motion for summary judgment was predicated upon the erroneous contentions that (1) the Eleanor from the Original Movie and Eleanor from the Remake are two different characters and marks; (2) the Eleanor from the Remake was not a derivative character of the Eleanor from the Original Movie; and (3) by the Agreement, Denice did not retain any rights (under federal copyright laws or common law trademark laws) to the character of Eleanor.  Such rights remained with HPC.

56.   Despite a wealth of evidence from the parties to the Agreement itself, *i.e.*, Denice and HPC, their counsel who negotiated the terms of the Agreement, and a written Acknowledgment from HPC that it was always the intent, desire and purpose of the parties and the Agreement that Denice retain for herself all right, title and interest in the merchandising for "Eleanor," in whatever form she appears in the Original Movie *and* the Remake, Judge Otero found that, although HPC had standing to bring the claims asserted in the Prior Action against the defendants, the plaintiffs lacked standing to do so based upon any conduct relating to the Remake Eleanor. Judge Otero denied the plaintiffs' motion for reconsideration of the order, filed on or about November 28, 2005.  Thereafter, on or about May 2, 2006, a final judgment was entered in the Prior Action.

57.   On or about May 26, 2006, the plaintiffs in the Prior Action timely filed a notice of appeal from the judgment on the complaint and from the order denying reconsideration.  This appeal is currently pending before the United States Court of Appeals for the Ninth Circuit, Court of Appeal Case No. 06-55807.

-15-
**[PROPOSED] FIRST AMENDED COMPLAINT**

58.    In light of the ruling in the Prior Action, and to avoid any confusion, on or about July 2007, HPC and Denice entered into a "Quitclaim Agreement" in which HPC "quitclaim[ed] to [Denice] Halicki all of HPC's goodwill, right, title and interest of every kind and nature whatsoever in and to" the "merchandising rights ('Eleanor Merchandising Rights') to that certain car called 'Eleanor' as such car appears in a remake ('Remake') of the 1974 film 'Gone in 60 Seconds' ('Original Picture')." Pursuant thereto, Denice has the sole and exclusive right to merchandise any good or item bearing the character, likeness, name or mark of "Eleanor" from the Original Movie and the Remake, and to pursue and enforce any infringement of such right by any third party. By virtue of the Quitclaim Agreement with HPC and the licensing agreement with The Original Gone in 60 Seconds LLC, and all of the rights and interests conferred thereunder, Plaintiffs and HPC will be used interchangeably throughout this Complaint.

**Defendants' Recent And Continuing Wrongful Conduct**

59.    Since the filing of their summary judgment motion in the Prior Action, Defendants well knew that it was simply a matter of time before their "gravy train" would come to a screeching halt and that they would be made to pay the price for their deception and lies. After all, Defendants' main defense presented in the Prior Action in opposition to the claims for intentional infringement of Plaintiffs' copyright and trademark in "Eleanor" was that HPC, not Plaintiffs, owned such rights. Defendants *never* asserted that they, and not anyone else, owned any such intellectual property right and that they, and not anyone else, had the right to manufacture the infringing vehicles. Rather, as set forth above, Defendants admitted that they had no right to the "Eleanor" mark or character. Thus, other than the technical (and erroneous) "standing" argument, Defendants knew they had no basis to defend any claim brought by the Defendants.

60.    With the evidence submitted by Plaintiffs in connection with the summary judgment motion in the Prior Action, Defendants clearly saw the writing on

1    the wall and recognized that HPC would confirm Plaintiffs' *exclusive* rights in and to

2    the "Eleanor" name, character, likeness, image, and mark.  Defendants no doubt

3    foresaw that HPC would execute the Quitclaim Agreement (or some similar

4    document) that would form the basis of the instant action and that Defendants' fraud

5    perpetrated on the Court and the public would soon be exposed.  And, with that

6    knowledge, came Defendants most audacious plan of all.

7        61.    Plaintiffs are informed and believe, and based thereon allege, that,

8    knowing they only had a limited amount of time before their house of cards came

9    crashing down around them, Defendants set upon a further scheme and conspiracy to

10   abscond with as much money as they could before the law caught up to them.  In that

11   regard, Plaintiffs are informed and believe, and based thereon allege, that within the

12   last two years, Defendants received over $7 million in deposits from unsuspecting

13   customers from around the world who placed orders for the "Eleanor" knock offs.

14   Plaintiffs are further informed and believe, and based thereon allege, Defendants took

15   the deposits without any intention of manufacturing or producing the offending

16   vehicles.  Indeed, many of the orders (approximately 60-70) have yet to be processed

17   by Defendants despite the passage of months – even years – since the payment of the

18   deposits.  Defendants' plan appeared to be simple: take as many orders from

19   customers as possible, obtain the deposits for the orders (as much as $100,000 per

20   car), never process the orders, and take off with or hide the money before the

21   customers realized that Defendants had no right or authority (or even ability) to

22   produce the knock off vehicles.  Defendants' plan yielded them millions and millions

23   of dollars in illegal gains.  Plaintiffs are informed and believe, and based thereon

24   allege, that at least ten different lawsuits have been filed against Defendants by

25   customers defrauded by Defendants' scheme and conspiracy.

26       62.    Moreover, based upon complaints lodged by various of these defrauded

27   customers, Plaintiffs are informed and believe, and based thereon allege, that the

28   Federal Bureau of Investigation ("FBI"), the Farmers Branch Police Department

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

1  located in Dallas County, Texas, and/or other law enforcement agencies launched an
2  investigation into Defendants' conduct.  As a result of such investigation, on or about
3  November 6, 2007, Plaintiffs are informed and believe, and based thereon allege, that
4  these agencies conducted a raid of the Unique Defendants' facilities located in Dallas,
5  Texas.  This raid was widely publicized through television newscasts as well as print
6  media.  Indeed, the raid was a featured story not only on the local television channels
7  in Dallas, Texas where it took place, but nationally, including in San Diego, California
8  and other parts of California.  The story was also featured prominently on various
9  websites on the internet, including, but not limited to, most of the automotive industry
10  websites and TMZ.com, a wildly popular entertainment website appealing to the
11  general public.

12      63.    The television newscasts of the raid showed dozens of cars (over 60)
13  being confiscated by law enforcement officers and being towed from Unique's
14  premises.  They also showed various Unique employees, including, upon Plaintiffs'
15  information and belief, the founders of Unique, being led away in handcuffs.
16  Plaintiffs are informed and believe, and based thereon allege, that these individuals
17  were formally arrested by the Farmers Branch Police Department.  In addition to the
18  vehicles, Plaintiffs are informed and believe, and based thereon allege, that the law
19  enforcement agencies also confiscated all car parts, documents, and other items from
20  the premises and shut down Unique's operation.

21      64.    The story, however, does not end there.  As reported by the various news
22  channels, and Plaintiffs are informed and believe, and based thereon allege, that, not
23  only did Defendants fail to deliver any cars to the customers after taking their
24  deposits, Defendants also engaged in the illegal practice of "title washing."  In
25  essence, "title washing" – much like money laundering – is a process to "clean" title to
26  stolen or salvaged vehicles.  In this instance, one Farmers Branch Police Department
27  officer described the process as follows: Defendants would take a salvaged vehicle,
28  take the title to a title company, obtain a bonded title from the title company, then take

1  that bonded title to a different state and obtain a new title that does not show that the

2  car was salvaged.  In this way, Defendants could obtain a "clean title" for the salvaged

3  vehicle.  Various other news reports also alleged that this "title washing" scheme may

4  have been employed by Defendants to clean title to stolen vehicles as well as to

5  salvaged vehicles.  As reported by the news media, and according to the Farmers

6  Branch Police Department, the cars confiscated from Unique's premises show false

7  vehicle identification number placards having been placed over the original placards

8  and real vehicle identification numbers having been scratched out to make it

9  impossible to trace the true origins of the cars.  It is believed that each and every car

10  ever produced and sold by Unique will now be reviewed by these agencies for their

11  legitimacy.

12       65.   Yet, there is more.  Plaintiffs are informed and believe, and based thereon

13  allege, that within days of the arrest and raid, on or about November 12, 2007,

14  defendant Unique Performance filed for Chapter 7 bankruptcy in the United States

15  Bankruptcy Court in the Northern District, Dallas, Texas.  Plaintiffs are informed and

16  believe, and based thereon allege, that the bankruptcy filing was merely a part of

17  Defendants' on-going plan and scheme to defraud their customers, Plaintiffs, and

18  other creditors.  In point of fact, Doug S. Hasty, a founder and Chief Executive Officer

19  of Unique Performance gave an interview less than ***one-month*** before the bankruptcy

20  filing, on October 16, 2007, in which he stated that Unique Performance then had 106

21  vehicle orders in various stages of production, that they were much further along in

22  terms of their growth and ability to produce vehicles than even a year ago, and, ***most***

23  ***significantly***, that Unique Performance had just completed a round of funding that will

24  ensure that the company could continue to complete the cars on order ***and take***

25  ***additional new orders going forward***.  Notwithstanding such representations,

26  however, Unique Performance initiated what Plaintiffs are informed and believe is a

27  sham bankruptcy proceeding.

28

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

66.   Plaintiffs' worst fears have come true.  Defendants' by their criminal and wrongful conduct have tarnished and damaged – perhaps irrevocably and irreparably – the "Eleanor" mark that Plaintiffs have spent years cultivating and developing, as set forth above.  By their deliberately false representations and statements, the public has been misled to believe that Defendants were the creators and originators of the "Eleanor" vehicles.  Thus, now, by Defendants' actions, subsequent arrest, and sham bankruptcy filing, the public will associate "Eleanor" with potential criminals.  Indeed, one blogger, in commenting on the story of the raid, noted that this appeared to be a case of life imitating art – *i.e.*, Defendants, the "makers" of "Eleanors" appeared to be living the story of "Gone in 60 Seconds."

## FIRST CLAIM FOR RELIEF

### (For Common Law Trademark Infringement Against All Defendants)

67.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth above at paragraphs 1 through 64, inclusive, as though fully stated herein.

68.   The marks "Eleanor" and "Gone in 60 Seconds" from the Remake are the properties of Plaintiffs, who own common law trademark rights and protections in the marks "Eleanor" and "Gone in 60 Seconds."

69.   The marks "Eleanor" and "Gone in 60 Seconds" are indicators of source, namely Plaintiffs' rights as described herein.

70.   Defendants and each of them are aware of Plaintiffs' rights in and to the marks "Eleanor" and "Gone in 60 Seconds" as an indicator of source.

71.   Defendants were and are consciously aware of the marks "Eleanor" and "Gone in 60 Seconds" and have among other things marketed the offending motor vehicles in the stream of commerce in a manner that treads on Plaintiffs' rights with full knowledge of them.  Defendants' marketing of the "Eleanor" replica cars and

1    other commercial activities infringe Plaintiffs' common law trademark rights under

2    Federal and California law in and to the marks "Eleanor" and "Gone in 60 Seconds."

3         72.    Plaintiffs never gave Defendants permission to conduct their offending

4    activities. Plaintiffs did not have knowledge of Defendants' offending activities until

5    February 2005.

6         73.    As a direct and proximate result of the foregoing conduct, Plaintiffs are

7    entitled to damages as against all Defendants and each of them in an amount that is

8    presently unknown, to disgorgement of Defendants' profits, to a preliminary and

9    permanent injunction, and to any and all other relief the Court deems just and proper

10    under the law.

11

12                    **SECOND CLAIM FOR RELIEF**

13        **(Federal Unfair Competition Against All Defendants)**

14         74.    Plaintiffs reallege and incorporate herein by this reference the allegations

15    of paragraphs 1 through 71 hereof, inclusive, as if set forth in full herein.

16         75.    Defendants and each of them have made and continue to make use in

17    commerce of Plaintiffs' common law trademarks and trade names relating to

18    "Eleanor" and the "Gone in 60 Seconds" film without Plaintiffs' permission.

19         76.    Plaintiffs represent the sole source of "Eleanor" and the "Gone in 60

20    Seconds" film.

21         77.    Defendants and each of them have used Plaintiffs' trademarks and trade

22    names in a manner that creates a false association between Defendants and Plaintiffs'

23    property rights in "Eleanor" and the "Gone in 60 Seconds" film.

24         78.    Defendants' use of Plaintiffs' common law trademarks, trade names,

25    goodwill and other rights is in direct violation of 15 D.S.C. 1125(a) *et seq.*, and

26    represents a false designation of origin and/or source entitling Plaintiffs to all

27    remedies available under law.

28

-21-
**[PROPOSED] FIRST AMENDED COMPLAINT**

79.   As a direct and proximate result of the foregoing conduct, Plaintiffs are entitled to damages as against all Defendants and each of them in an amount that is presently unknown, to disgorgement of Defendants' profits, to a preliminary and permanent injunction, and to any and all other relief the Court deems just and proper under the law.

## THIRD CLAIM FOR RELIEF

### (For Dilution of Trademark Against All Defendants)

80.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth above at paragraphs 1 through 77, inclusive, as though fully stated herein.

81.   Plaintiffs' mark "Eleanor" is distinctive and famous. The "Eleanor" mark is inherently strong and distinctive, has long and continuously been used in connection with the goods on which it appears, has long and continuously been the subject of advertising and promotion, has been used and advertised throughout the United States and internationally, is recognized by consumers and those in the trade, and is in substantially exclusive use, as alleged above.

82.   Defendants' acts have lessened the capacity of Plaintiffs' famous "Eleanor" mark to identify and distinguish Plaintiffs' goods. Defendants' acts have blurred the unique association which has heretofore existed between Plaintiffs' "Eleanor" mark and goods manufactured or licensed by Plaintiffs. Defendants' acts were commenced and committed after Plaintiffs' mark became famous.

83.   Defendants' activities, as alleged hereinabove, threaten to dilute, and have diluted, Plaintiffs' distinctive trademark. By reason of Defendants' acts, Plaintiffs have suffered, and will suffer, damage to their business, reputation, and goodwill, and the loss of sales and profits Plaintiffs would have made but for Defendants' acts in an amount to be established according to proof.

84.    Plaintiffs are without an adequate remedy at law in that the continuing nature of Defendants' acts of infringement and dilution will cause severe and irreparable injury that cannot be completely or adequately measured or compensated by damages.  Pursuant to 15 U.S.C. § 1116, Plaintiffs are, therefore, entitled to a permanent injunction enjoining Defendants' continuing acts of infringement and dilution.

85.    Plaintiffs are informed and believe, and based thereon allege, that, in engaging in the above described conduct, Defendants wilfully intended to trade on Plaintiffs' reputation and/or to cause dilution of Plaintiffs' "Eleanor" trademark. Plaintiffs have been damaged as a result of these wrongful acts in an amount to be established according to proof.  Pursuant to 15 U.S.C. § 1117(b), Plaintiffs are entitled to recover three times its actual damages or three times Defendants' profits, whichever is greater, together with Plaintiffs' attorneys' fees.  In addition, pursuant to 15 U.S.C. § 1118, Plaintiffs are entitled to an order requiring destruction of all infringing products and promotional materials in Defendants' possession.

## FOURTH CLAIM FOR RELIEF

### (For Copyright Infringement Against All Defendants)

86.    Plaintiffs reallege and incorporate by this reference each and every allegation set forth above at paragraphs 1 through 83, inclusive, as though fully stated herein.

87.    Plaintiffs are the exclusive owner of the goodwill, right, title and interest of every kind and nature whatsoever in and to the merchandising rights to the car character called "Eleanor" as it appears in the Remake.  The Remake and all characters therein, including "Eleanor," were registered for a copyright on June 28, 2000 (Registration No. PA0000933893).

1    88.   Eleanor is the featured star of the Remake and represents the story as it is

2  told in the film.   Plaintiffs have continuously protected the copyright in Eleanor and

3  the Remake since 2000 and Plaintiffs continue to do so.

4    89.   Defendants were and are consciously aware of "Eleanor" and the Remake

5  and among other violations have marketed and continue to market the offending motor

6  vehicles and other products with full knowledge of Plaintiffs' rights.

7    90.   Defendants' marketing of the "Eleanor" replica cars and other products

8  infringes Plaintiffs' copyrights in and to Eleanor and "Gone in 60 Seconds."

9    91.   Plaintiffs never gave Defendants permission to conduct their offending

10  activities.  Plaintiffs did not have knowledge of Defendants' offending activities until

11  February 2005.

12    92.   As a direct and proximate result of the foregoing conduct, Plaintiffs are

13  entitled to damages as against all Defendants and each of them in an amount that is

14  presently unknown, to disgorgement of Defendants' profits, to a preliminary and

15  permanent injunction, and to any and all other relief the Court deems just and proper

16  under the law.

17

18    **FIFTH CLAIM FOR RELIEF**

19    **(Constructive Trust /Accounting)**

20    93.   Plaintiffs reallege and incorporate herein by this reference the allegations

21  of paragraphs 1 through 90 hereof, inclusive, as if set forth in full herein.

22    94.   Defendants hold those commercial profits and personal gains which have

23  accrued to them as a result of infringement and other wrongful acts described herein

24  as constructive trustees of those commercial profits and personal gains, for the benefit

25  of Plaintiffs.

26    95.   Plaintiffs seek an accounting of said funds, and an order declaring that

27  Defendants hold said funds in trust for Plaintiffs.

28

**[PROPOSED] FIRST AMENDED COMPLAINT**

162466.1

## SIXTH CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

96.   Plaintiffs reallege and incorporate herein by this reference the allegations of paragraphs 1 through 93 hereof, inclusive, as if set forth in full herein.

97.   Plaintiffs have consistently used the "Eleanor" and "Gone in 60 Seconds" marks from the Original Movie in commerce since 1974, and the same marks from the Remake since 2000, and they have protected the use of these marks.  Plaintiffs are thus the first and continued users of the "Eleanor" and "Gone in 60 Seconds" marks.

98.   Despite the fact that Plaintiffs are the prior user of the marks, in 2004 Defendant Carroll Hall Shelby Trust registered an "Eleanor" trademark with the Patent and Trademark Office, registration number 2837333 (the "Registration").

99.   The conduct of Defendants as set forth above has caused harm to Plaintiffs by interfering with and disrupting Plaintiffs' reasonable expectation of prospective economic advantage from the use of the rights and property Plaintiffs own and control relating to "Eleanor" and the "Gone in 60 Seconds" film, and by creating a false association between Defendants and Plaintiffs.

100.   An actual controversy has arisen and exists between Plaintiffs and Defendants for which Plaintiffs have no adequate remedy at law in that Defendants claim a valid registration in a trademark to which Plaintiffs hold rights as a prior user. It is appropriate and justice requires that the Court enter a judgment declaring the invalidity of the Registration due to Plaintiffs' prior use.

101.   Plaintiffs therefore seek an order from the Court, pursuant to 15 U.S.C. §1119, instructing the United States Patent and Trademark Office to cancel the Registration.

/ / /

/ / /

/ / /

/ / /

162466.1           **[PROPOSED] FIRST AMENDED COMPLAINT**

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

102.  Plaintiffs reallege and incorporate herein by this reference the allegations of paragraphs 1 through 99 hereof, inclusive, as if set forth in full herein.

103.  Defendant Carroll Hall Shelby Trust has applied for registration of the "GT -500" trademark for automobiles.

104.  An actual controversy has arisen and exists between Plaintiffs and Defendants for which Plaintiffs have no adequate remedy at law in that Defendants apparently claim that Defendant Carroll Hall Shelby Trust's application for registration of the "GT-500" trademark permits them to market Eleanor-branded vehicles, despite Plaintiffs' ownership of the "Eleanor" mark.  It is appropriate and justice requires that the Court enter a judgment declaring that Defendants do not have any right in the "Eleanor" or "Gone in 60 Seconds" marks by virtue of the registration of the "GT-500" mark.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

1.  For general damages in an amount to be proven at trial;

2.  For punitive damages in an amount to be proven at trial sufficient to punish and deter Defendants from engaging in such activity in the future;

3.  For damages and disgorgement of lost profits, past and future, in an amount to be proven at trial;

4.  For damages for loss of recognition by Plaintiffs;

5.  For injunctive relief as against Defendants and each of them;

6.  For an accounting;

7.  For an order declaring that Defendants hold the funds which they have gained as a result of their wrongful acts as constructive trustees for the benefit of Plaintiff;

162466.1
**[PROPOSED] FIRST AMENDED COMPLAINT**

1      8.     For an order instructing the United States Patent and Trademark Office to

2   cancel the registration for the Eleanor mark, registration number 2837333;

3      9.     For an order declaring that application for the "GT-500" mark does not

4   grant rights to use of the Eleanor or "Gone in 60 Seconds" marks;

5      10.    For costs of suit;

6      11.    For any applicable and appropriate pre- and post-judgment interest;

7      12.    For any other relief that the Court deems just and proper.

8

9   Dated:  December 13, 2007          BROWNE WOODS & GEORGE LLP
                                       Allan Browne
10                                     Sonia Y. Lee

11

                                       By  /s/ Allan Browne
12                                         Allan Browne
                                       Attorneys for Plaintiffs DENICE
13                                     SHAKARIAN HALICKI, THE
                                       ORIGINAL GONE IN 60 SECONDS
14                                     LLC, HALICKI FILMS LLC, and
                                       ELEANOR LICENSING, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

162466.1

-27-
**[PROPOSED] FIRST AMENDED COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2  Plaintiffs hereby demand a trial by jury as to all issues properly so tried.

3

4 Dated:  December 13, 2007

BROWNE WOODS & GEORGE LLP
  Allan Browne
  Sonia Y. Lee

5

6            By:  /s/ Allan Browne
               Allan Browne

7            Attorneys for Plaintiffs DENICE
            SHAKARIAN HALICKI, THE

8            ORIGINAL GONE IN 60 SECONDS
            LLC, HALICKI FILMS LLC, and

9            ELEANOR LICENSING, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

162466.1

-28-
**[PROPOSED] FIRST AMENDED COMPLAINT**